128 N.J. Super. 589 (1974)
321 A.2d 275
STATE OF NEW JERSEY, PLAINTIFF,
v.
HOWARD R. HUDES, DEFENDANT.
Superior Court of New Jersey, Bergen County Court, Criminal Division.
May 16, 1974.
*593 Ms. Alice Meyer, Assistant Prosecutor for the State (Joseph C. Woodcock, Prosecutor of Bergen County, attorney).
Mr. Leopold A. Monaco for defendant (Messrs. Monaco & Oratio, attorneys).
PETRELLA, J.C.C.
Defendant appeals de novo, on the record below, to the Bergen County Court from a January 23, 1974 judgment of the Hillsdale Municipal Court finding him guilty of operating a motor vehicle while his ability was impaired, in violation of N.J.S.A. 39:4-50 (b), and imposing a $50 fine, $10 costs, and a six-month revocation of license, which were stayed pending this appeal.
The record supports the findings that at approximately 1:25 A.M. on November 23, 1973 a Hillsdale police officer had his attention drawn to a car backfiring, followed it for approximately one-half mile before stopping it, and during that distance observed it weave or swerve across the highway center line on six separate occasions. Defendant, after exiting his vehicle, was unsteady on his feet, he "swayed", "staggered" and "seemed unsure of himself," and had difficulty producing his operator's license and vehicle registration. The arresting officer and a backup officer testified to "a strong odor of alcoholic beverage" on defendant's breath. The defendant admitted he had consumed several beers. He was placed under arrest at the scene and taken to headquarters where certain coordination tests and a breathalyzer test were performed.
*594 Defendant was advised of his right under N.J.S.A. 39:4-50.2(c) to have independent tests made by a person of his own selection. He consented to the breathalyzer test, but also demanded a blood test. He was told he could go to a qualified doctor or hospital and have a specimen taken, but was allowed no opportunity to do so before the two breathalyzer tests were administered between 2:15 and 2:30 A.M. Because of defendant's initial reluctance to post a $100 bond he did not leave the police station until about 4:25 A.M., which was after his mother arrived. There is no indication in the record below of whether defendant did or did not go for any independent blood test upon release.
The physical coordination tests given at police headquarters included a finger-to-nose test (which defendant missed four out of five times); leaning over forward and then backward (defendant performed well on the leaning forward part, but lost balance leaning backward), and a straight-line walking test (which required "much effort") as well as some other tests, including speech.
The municipal judge received into evidence, over objection as hearsay, two inspection certificates for the municipality's one breathalyzer machine, which indicated that on dates prior to and after it was used to test defendant, i.e. October 18, 1973 and December 21, 1973, respectively, the machine was inspected by a State Police "coordinator" and found to be in proper working order. This coordinator covers a wide area of the State, performing inspections of breathalyzer machines used by law enforcement agencies. By virtue of special training he may often testify as an expert on certain machine functions and its operation, as well as concerning the ampoules used. The municipal judge admitted the two inspection certificates into evidence under Evid R. 63(13), entitled "Business Entries," as an exception to the hearsay rule. The results of the two breathalyzer tests of defendant both showed 0.11% of alcohol in his blood. There was no objection to the operator's qualifications nor to the *595 manner, described in detail, in which he prepared, tested and operated the breathalyzer.
The officer conducting the physical tests and the breathalyzer tests used certain standardized forms, including an alcohol influence report, to record the test results and other information, including a description of physical condition. The forms for recording the machine-scale readings were introduced into evidence with the testimony of the operator that they were those prepared by the breathalyzer manufacturer. The alcohol influence report was a local form, common to that in use in the county and throughout the State and appears modelled after the New Jersey State Police Alcohol Influence Report Form, labelled "S.P. 111 (Rev. 9/69)." Defendant objected that there was no proof that the local form used was authorized by the Attorney General's office pursuant to N.J.S.A. 39:4-50.3, although a comparison makes it obvious that the forms are substantially identical.
This appeal is on various grounds: first, that the certificates indicating the breathalyzer inspection should not have been admitted without the testimony of the trooper co-ordinator; second, if the certificates were inadmissible, the breathalyzer test results should not have been admitted; third, that the alcohol report forms should have been those authorized by the Attorney General, and fourth, that defendant was not allowed to have independent blood tests made by a person of his own selection and defendant urges this should render the breathalyzer results inadmissible.

I

The Certificate of Operability of the Breathalyzer Was Properly Admitted Into Evidence.
Defendant asserts the trial court mistakenly admitted into evidence the certificates of operability of the breathalyzer, without allowing him an opportunity on the State's case to cross-examine the qualifications and findings of the trooper *596 coordinator. The qualifications of the machine operator were not questioned based on his operator certification by the Attorney General.

A
Defendant relied in the trial court, as in this appeal, on so much of State v. Conners, 125 N.J. Super. 500 (Cty. Ct. 1973), which indicates that while the lay evidence there sustained the conviction, such certificates should be inadmissible under the business records exception to the hearsay rule, Evid. R. 63(13). Of course, this court is not bound by the decision of a trial court of equal jurisdiction. Ferraro v. Ferro Trucking, 72 N.J. Super. 519, 523 (Law Div. 1962); and see, Lackovic v. New England Paper Tube Co., Inc., 127 N.J. Super. 394, 398 (Law Div. 1974).
The argument can be summarized by two quotations, the latter limits the scope of the former. It was stated in State v. Miller, 64 N.J. Super. 262 (App. Div. 1960), while discussing the predecessor to the more modern breathalyzer:
The Drunkometer is sufficiently established and accepted as a scientifically reliable and accurate device for determining the alcoholic content of the blood to admit testimony of the reading obtained upon a properly conducted test, without any need for antecedent expert testimony by a scientist that such reading is a trustworthy index of blood alcohol, or why. [at 268]
The requirements for use of such tests were spelled out in State v. Johnson, 42 N.J. 146 (1964):
It is, of course, most essential, in view of the heavy impact the result can have, that proper administration of the test be clearly established before the reading is admitted in evidence. This includes full proof that the equipment was in proper order, the operator qualified and the test given correctly (as well as the fact that the defendant consented orally or in writing). [at 171]
In this case the breathalyzer was certified as in proper operating condition on dates prior to and after defendant *597 was tested, and there was testimony of the operator who checked the machine that he found it functioning properly before he used it. This is certainly prima facie proof that the machine was in proper order. The coordinator would not add significantly to this under the circumstances. In fact, the evidence, whether by the inspection certificates, coordinator, or both, is, and perforce must be, largely circumstantial  unless it is to be a requirement that the coordinator must be present during the actual administration of each test. The acceptance of the breathalyzer as a scientifically reliable and accurate device makes additional testimony unnecessary in the usual case unless there is some special circumstance requiring a full scientific hearing on the accuracy of a particular machine. Cf. State v. Salup, 128 N.J. Super. 209 (App. Div. 1974); State v. Finkle, 128 N.J. Super. 199 (App. Div. 1974) (taking judicial notice of scientific accuracy of VASCAR).
But such a determination is not always required. For instance, in State v. DeVito, 125 N.J. Super. 478 (App. Div. 1973), the Appellate Division held the use of a random test sample of the ampoule used in the administration of a breathalyzer test was sufficient prima facie proof that the chemicals in any one ampoule were of the proper kind and mixed to the proper proportion. Although the DeVito case indicates that the State had proved the breathalyzer was in proper working order, it is not clear from the opinion whether the state trooper coordinator testified.
That these machines are not often inaccurate or prone to failure was discussed in State v. Lanahan, 110 N.J. Super. 578 (Cty. Ct. 1970), which approved the Attorney General's administrative order changing the periodic testing of breathalyzer instruments from monthly to bimonthly. The court there made reference to the experience of accuracy and reliability of the instrument and the lack of malfunctioning as warranting the change in the time period. Such testimony was given in Lanahan by the state testing coordinator for breathalyzers and drunkometers. The conviction was upheld *598 although the machine had been tested and was found in operating condition eight days before the defendant was tested, but the next test had not been conducted before the time of the trial. 110 N.J. Super. at 581-583. Thus, the only relevant certificates of operability available were those prior to the examination of the defendant, which did not permit any cross-examination by defense counsel as to whether the machine could be inferred to be in proper order at the time of defendant's examination. Lanahan dealt with circumstantial evidence and with a presumption of proper working condition of the machine, if working properly prior to the examination of a driver, unless the defense could by suggestion, evidence, proof or circumstance establish the inaccuracy or malfunction of the instrument.
Defendant contends in the instant case that satisfactory operability can only be established by cross-examination of the individual conducting the inspections of the machine, rather than by proof of inspection and whatever checks are made by the operator. However, cross-examination, and indeed examination, is sometimes limited in several areas where circumstances warrant, e.g., the business records exception, and reports by public officials. In the latter examples, documents may be offered in evidence for the truth of their contents.

B
The business records exception was originally meant for records trusted and relied upon by businessmen in commercial circumstances. See Mahoney v. Minsky, 39 N.J. 208 (1963). Primary use of the exception was in civil cases, but this was before the days when government, and law enforcement in particular, had to cope with modern record-keeping requirements and employed modern equipment, resulting in more complex problems of proofs.
*599 Such evidence rules and acts as the former Business Records as Evidence Act, N.J.S.A. 2A:82-34[1], et seq. (compare 9A Uniform Laws Annotated 504), broaden the area of admissibility of relevant evidence where there is necessity and sufficient guarantee of trustworthiness. Laughlin, "Business Entries and the Like," 46 Iowa L. Rev. 276, 305 (1961); Norville, "The Uniform Business Records as Evidence Act," 27 Ore. L. Rev. 188 (1948); 30 Am. Jur.2d, Evidence, § 927; 5 Wigmore, Evidence (3d ed. 1940), § 1528; McCormick, Evidence, (2d ed. 1972), §§ 304-314.
Evid. R. 63(13), "Business Entries" provides:
A writing offered as a memorandum or record of acts, conditions or events is admissible to prove the facts stated therein if the writing or the record upon which it is based was made in the regular course of a business, at or about the time of the act, condition or event recorded, and if the sources of information from which it was made and the method and circumstances of its preparation were such as to justify its admission.
The purposes of this type of rule are: broaden the unavailability concept, and take into account modern advances in business conditions and the inherent reliability of business methods and systems as well as the practical necessity for convenient proofs. See Polasky and Polson, "Business Entries," 4 Utah L. Rev. 327-334 (1955).
The early rule, much narrower in scope, was based on a rather ancient exception to the hearsay rule, "the common law shopbook law," and consistently proscribed such matters as proof of amounts owed or payments to the bookkeeper *600 by entries in his own books. See Johnson v. Hoffman, 7 N.J. 123 (1951). When Johnson was decided the Uniform Act was in effect in New Jersey, but the case apparently arose in the trial court before the effective date. In any event, N.J.S.A. 2A:82-34, the statute then in effect, was not referred to in that decision. The rule was liberalized by the New Jersey equivalent of the Uniform Act and the subsequent Rules of Evidence. See, e.g., Mahoney v. Minsky, supra.
Generally speaking, regularly kept records are properly allowed in evidence, subject to the discretionary authority of the trial judge under Evid. R. 4. The common law exception had four elements: (1) the entries must have been original entries made in the routine of business, (2) must have been made upon personal knowledge of the recorder or of someone reporting to him, (3) must have been made at or near the time of the transaction recorded, and (4) the recorder and his informant had to be shown to be unavailable. See Chaffee v. United States, 18 Wall. (U.S.) 516, 21 L.Ed. 908 (1873); Nicholls v. Webb, 8 Wheat. (U.S.) 326, 5 L.Ed. 628 (1823).
The modern approach requires that the "writing offered as a memorandum or record of acts, conditions or events" be made (1) in the regular course of a "business", (2) at or near the time of the act, condition or event recorded, and (3) if the sources of information and method and circumstances of preparation justify its admission. Evid. R. 63(13). The requirement of unavailability of the recorder has been eliminated.
As noted, government in general, and a law enforcement department in particular, were not thought of as businesses. However, it has become obvious in more modern times, that the complex operations of an efficient government require efficient techniques, management and procedures. Law enforcement is no exception and the court considers reports and records kept in connection with such enforcement as "business records" within the meaning of *601 Evid. R. 63(13). Brown v. Mortimer, 100 N.J. Super. 395 (App. Div. 1968); Fagan v. Newark, 78 N.J. Super. 294 (App. Div. 1963). See Evid. R. 62(5).
Should the rule be any different in a quasi-criminal proceeding under the Motor Vehicle Act? Police accident reports are regularly admitted in civil cases under the regularly kept records exception, as well as similar reports of investigation. See Schneiderman v. Strelecki, 107 N.J. Super. 113, 119 (App. Div. 1969), certif. den., 55 N.J. 163 (1969); Rogalsky v. Plymouth Homes, Inc., 100 N.J. Super. 501 (App. Div. 1968), certif. den., 52 N.J. 167 (1968); Official Comments to Evid. R. 63(13); McCormick, Evidence, supra, § 316, at 727; Annotation, 69 A.L.R.2d 1148; 30 Am. Jur.2d, Evidence, §§ 937, 939; and 32 C.J.S. Evidence § 685(1).
Perhaps the area where the personal knowledge requirement has the most impact concerns police reports and similar reports of investigations. In such cases there is little doubt that the report of the investigating officer was made in the regular course of a business * * *. [McCormick, supra at 727; (footnotes omitted)]
The certificate of operability complies with the requirements of Evid. R. 63(13) for admission into evidence. It is a written document, made in the regular course of business by a trooper whose duty it is to inspect these machines, authenticated as the original, and made at the time of the testing of the breathalyzer.
The state trooper coordinator's testimony in cases brought under N.J.S.A. 39:4-50(a) and (b), et seq., involving the breathalyzer appears unnecessary in this case, absent special circumstances, in view of the prevalence of this machine in police departments throughout the State. In view of the number of such inspections, it can be expected that the coordinator would in most cases have to use the certificates or his records to refresh his recollection as the basis for his testimony.
*602 This situation is different from Rogalsky v. Plymouth Homes, Inc., supra, holding that the statement of a witness to an accident does not become admissible because it was included in a policeman's report. The material must be obtained from a trustworthy and reliable source. The certificate of operability contains direct evidence of one qualified to judge the working condition of a breathalyzer. The trooper coordinator tests the machine in accordance with guidelines prepared by the manufacturer, whose standards the machine must meet in order to be certified. There is little individual judgment left to the trooper coordinator other than to comply with the procedures and check the performance of the breathalyzer against the specifications. In the court's view, such certificates should be admissible under Evid. R. 63(13) in a proceeding under the Motor Vehicle Act.

C
The certificates of operability would also be admissible under Evid. R. 63(15), "Reports and Findings of Public Officials:"
Subject to Rule 64, a statement is admissible if in the form of (a) a written statement of an act done, or an act, condition or event observed by a public official if it was within the scope of his duty either to perform the act reported or to observe the act, condition or event reported and to make the written statement, or (b) statistical findings made by a public official whose duty it was to investigate the facts concerning the act, condition or event and to make statistical findings.
The certificate is basically a written statement of a public official with a duty to record the results of his first-hand observations. There is a presumption, absent contrary testimony, that those responsible for services to the public will carry out their duties in a proper, careful and prudent manner. See State v. Kuznitz, 105 N.J. Super. 33 (Cty. Ct. 1969); State v. Forer, 104 N.J. Super. 481 (Law Div. 1969).
*603 The trooper coordinator was authorized by his commanding officer to examine the breathalyzer involved in this case and he was under a duty to follow this command and to properly record the factual results as a "public official." See Evid. R. 62(3). The court can take notice of the fact that the State Police come under the direct supervision and control of the State Attorney General,[2] who is the head of the State Department of Law and Public Safety. The trooper comes within the scope of those designated as a public official within the contemplation of the evidence rule. The same public policy decision underlies this exception to the hearsay rule as that involving business records, that the official written report is more reliable than the memory of the official.
This, of course, does not preclude a defendant in a proper case, if he so elects, from challenging the accuracy of the readings on the machine by expert scientific witnesses, or preclude subpoenaing of the trooper coordinator. See State v. Johnson, supra, and State v. Finkle, supra. Discovery procedures would also allow a defendant to ascertain if the latter would be helpful or harmful to his case. Nor is the State precluded from seeking the testimony of the trooper coordinator if necessary or useful in a particular case.
In summary, the certificates were properly admissible as business records under Evid. R. 63(13) or as official records under Evid. R. 63(15).

II

The Requirement of Sequentially Numbered Reporting Forms.
The Attorney General is required by N.J.S.A. 39:4-50.3 to prescribe a uniform form for reports of "chemical analysis of breath" on forms which "shall be sequentially numbered." *604 The form referred to by this statute is the one used to report the "chemical analysis" and includes the local "Alcohol Influence Report" which appears on its face substantially identical to the State Police counterpart form.[3]
It is conceded that the form used to record the results of the defendant's performance on the breathalyzer were not sequentially numbered, as would appear to be required by the use of the word "shall" in N.J.S.A. 39:4-50.3. The omission of the forms being sequentially numbered does not appear to deny defendant a fair and impartial test nor deny him access to any materials, and further, no allegation has been made that a failure to sequentially number the forms rendered the results inaccurate, caused the machine to malfunction, or affected the recording of the breathalyzer reading by the operating officer. The same reasoning also applies to the forms used. There has been no showing of prejudice and there is no statutory right conferred which would warrant suppression of test results in all such examinations.
No constitutional rights are denied by the lack of sequentially numbered forms. The failure to give Miranda warnings prior to the administration of the breathalyzer test has been held not to invalidate the admission of test results. State v. Macuk, 57 N.J. 1 (1970); State v. Kenderski, 99 N.J. Super. 224 (App. Div. 1968). Additionally, the period when consent to the breathalyzer examination is requested by the police has been held not to be a "critical stage" of criminal proceedings requiring that the defendant be permitted to have the advice of counsel. State v. Pandoli, 109 N.J. Super. 1 (App. Div. 1970). Further, the imposition of any method of chemical analysis of the blood, breath or urine of a suspected inebriated driver does not violate the Fifth Amendment privilege against self-incrimination since *605 it is a search of the person for noncommunicative evidence. Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); State v. Kenderski, supra; State v. Swiderski, 94 N.J. Super. 14 (App. Div. 1967). Nor is there presently any constitutional right to a speedy trial in drunk driving cases. In re Emberton, 109 N.J. Super. 211 (App. Div. 1970).
Moreover, defendant did not even have the legal right to refuse to submit to the breathalyzer test since his very driving upon the highway acted as his consent to the taking of samples of his breath, so he cannot object to the manner of recording of the evidence so long as it was undertaken in a reliable and trustworthy manner. The implied consent statute was conceived and enacted for laudable public purposes and to serve valid state interests, including the avoidance of the use of force in obtaining samples, to assist in obtaining the most reliable evidence of driving while intoxicated, and to reduce the number of death-dealing drunken drivers on highways by administrative sanctions, including the suspension of drivers' license privileges.

III

The Right of Defendant to Have an Independent Test Made Pursuant to N.J.S.A. 39:4-50.2(c).
Defendant was informed of his statutory rights by the police officer before the breathalyzer test was administered, including his right to a blood test as required by N.J.S.A. 39:4-50.2(d). It is clear that such right arises after submission to the breathalyzer, otherwise the defendant might delay the test so that the results would be substantially affected. Indeed, State v. Pandoli, supra, 109 N.J. Super. at 3, held that the police need not wait for defendant to have the advice of an attorney before determining whether he would accede to the test, as far as the sanction of revocation for refusal is concerned. Prompt action by the State was warranted as an emergency measure to minimize loss of evidence. *606 See State v. McMaster, 118 N.J. Super. 476, 479 (App. Div. 1971); State v. Pandoli, supra, 109 N.J. Super. at 4; State v. Gillespie, 100 N.J. Super. 71, 85 (App. Div. 1968), certif. den., 51 N.J. 274 (1968); and State v. Tolbert, 100 N.J. Super. 350, 356 (Cty. Ct. 1968).
Defendant could have made arrangements for his own independent test after the breathalyzer test or after release from custody. His own actions in this case delayed his release. Defendant did not testify and there is no indication in the record that he asked to use the telephone following the test to set up a prompt appointment at a doctor's office or hospital for any additional test. There is also no suggestion that the police department should assume the responsibility or must assist a defendant in his arrangements for the test or transport him to his doctor or to an independent laboratory for a blood test.
In State v. Magai, 96 N.J. Super. 109 (Cty. Ct. 1967), it was noted that:
N.J.S.A. 39:4-50.2 is silent as to any given procedure to be employed in securing an independent analysis of a defendant's blood. The police could, as was done in this case, extend the use of the telephone to a defendant. On the other hand, a defendant could indicate his choice of a physician to the police who, in turn, would make the necessary arrangements. These and other reasonable means could be employed in the absence of any precisely defined procedure in the statute. Where a statute confers certain rights upon a defendant, the police are not thereby denied the authority to establish reasonable regulations in implementation of these rights; they are, perforce, charged with the duty of promulgating reasonable procedures to vouchsafe such rights to a defendant. [at 113]
The basic rights normally accorded one accused of a criminal offense must be accorded a defendant in a prosecution for drunken driving. State v. Ingram, 67 N.J. Super. 21 (Cty. Ct. 1961). The burden of proving voluntary consent to the breathalyzer is on the State. State v. Swiderski, supra.
There is no doubt that being informed of the statutory right to have an independent examination by a physician *607 or facility of defendant's choice is a right afforded by statute, and that non-compliance could vitiate a conviction for driving while under the influence or while impaired, if based solely on the chemical analysis. See State v. Blair, 45 N.J. 43 (1965) and State v. Tolbert, supra, 100 N.J. Super. at 356.
Blair arose before the amendments to the Motor Vehicle Act by L. 1966, cc. 141 and 142, involving implied consent to a blood test in cases under N.J.S.A. 39:4-50. In Blair the court construed N.J.S.A. 39:4-50.1 in the form enacted by L. 1951, c. 23, and applied an express requirement in that statute which read as follows: "No chemical analysis, as provided in this section, or specimen necessary thereto, may be made or taken unless expressly consented to, or requested by, the defendant." The court reversed on the ground that the State must prove express consent. The quoted language was deleted in 1966.
However, the facts of this case as appear in the record do not establish that this is such a case. Here, as distinguished from Blair, supra, the record is consistent with the finding that defendant was undisputedly advised of his rights under the statute and was told he could have the tests done after the breathalyzer test, if he elected to submit to that test.

IV

Independent Evidence Establishes the Impaired Ability of the Driver.
Even in the absence of any breathalyzer results, there is sufficient evidence in the record to indicate beyond a reasonable doubt that defendant was intoxicated to a prohibited degree which impaired his ability to operate his vehicle and thus sustain the conviction. The cumulative effect of the driving observed by the arresting officer, the inability of the defendant to promptly produce his operator's license and vehicle registration, his confused mental state, his performance *608 on the several physical coordination tests, the strong odor of alcohol on defendant's breath, his admitted consumption of alcoholic beverages and the observations of several other experienced police officers, leads to the conclusion beyond a reasonable doubt that the defendant's ability to operate was impaired.
Intoxication may be proved by nonexpert testimony based on observation. State v. Johnson, 42 N.J. 146, 166 (1964); State v. Guerrido, 60 N.J. Super. 505 (App. Div. 1960); State v. Conners, 125 N.J. Super. 500, 511-513 (Cty. Ct. 1973), and see Castner v. Sliker, 33 N.J.L. 95 (Sup. Ct. 1868). In the present case not only was defendant's ability to drive impaired as a result of intoxicating liquors proved by the scientific evidence, but the record supports the independent finding by the court, based on nonexpert testimony, that the defendant is guilty beyond a reasonable doubt of a violation of N.J.S.A. 39:4-50(b).
In light of State v. Nash, 64 N.J. 464 (1974), sentence will be imposed, with appropriate judgment pursuant to R. 3:23-8(e), of a $50 fine and revocation of driving privileges for a period of six months, the mandatory penalty under the statute, plus costs of $10, unless defendant wishes to be heard on sentence, in which case defendant is to present himself to the court for imposition of sentence forthwith.
NOTES
[1] N.J.S.A. 2A:82-35 had provided, before it was superseded in accordance with N.J.S.A. 2A:84A-40:

A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.
[2] See N.J.S.A. 52:17B-2 and 6.
[3] It is conceded that there is as yet no State regulation promulgated adopting such form. The Attorney General's office advises that a proposed rule or regulation on this subject is expected to be published in the near future in the New Jersey Register.